Royce **GRIFFIN**, as Commissioner of Securities for the State of Colorado, Petitioner,

v.

**S.W. DEVANNEY & CO., INC.,** and Stephen W. Devanney, Respondents.

No. 88SC118.

Supreme Court of Colorado, En Banc.

June 19, 1989.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Suzanne A. Fasing, Asst. Atty. Gen., Denver, for petitioner.

No appearance by respondents.

Joseph C. Long, Norman, Okl., for amicus curiae, North American Securities Administrators Ass'n, Inc.

QUINN, Chief Justice.

Section 11–51–117(2) of the Colorado Securities Act of 1981, §§ 11–51–101 to 11– 51–129, 4B C.R.S. (1987), states that "[n]o provision of this article authorizes the [S]ecurities [C]ommissioner or any of his officers or employees to disclose [any information filed with or obtained by the Commissioner and not made public] except among themselves or when necessary or appropriate in a proceeding or investigation under this article." In *S.W. Devanney & Co., Inc. v. Griffin,* 757 P.2d 1088 (Colo. App.1988), the court of appeals held that this statutory provision prohibited the Securities Commissioner from disclosing to other regulatory and law enforcement agencies information regarding possible law violations obtained by the Commissioner during an examination of the books and records of a securities broker-dealer operating in the State of Colorado. We granted certiorari to review the decision of the court of appeals, and we now reverse the judgment.

I.

A.

The Securities Act of 1981 became effective on July 1, 1981, and was a repeal and reenactment with amendments of pre-existing legislation known as the "Securities Act." Ch. 119, secs. 1–6, §§ 11–51–101 to 11–51–129, 24–34–104, 1981 Colo.Sess.Laws 632–58. The 1981 act establishes the Division of Securities within the Department of Regulatory Agencies and designates the Securities Commissioner (hereinafter referred to as commissioner) as head of the Division, with authority to administer and enforce all the provisions of the act. §§ 11–51–103 and 11–51–117, 4B C.R.S. (1987).

One of the primary purposes of the 1981 act is to protect the public from fraudulent and deceptive practices. It accomplishes this goal in several ways. It requires brokers and dealers[1] engaging in securities

1. Section 11–51–102(2), 4B C.R.S. (1987), defines the terms "broker" and "dealer" as follows:

   (a) "Broker" means any person engaged in the business of effecting transactions in securities for the account of others, but "broker" does not include a bank.

   (b) "Dealer" means any person engaged in the business of buying or selling securities for his own account, through a broker or otherwise, but "dealer" does not include a bank and does not include any person insofar as he buys or sells securities for his own account,

transactions to register with the commissioner, §§ 11–51–105 and 11–51–106, 4B C.R.S. (1987), and requires the issuer of a security to file a registration statement with the commissioner, §§ 11–51–108 and 11–51–109, 4B C.R.S. (1987). The 1981 act also contains criminal and civil penalties for fraudulent or deceptive practices in connection with the sale of securities, § 11–51–123, 4B C.R.S. (1987), and delegates to the commissioner rulemaking authority, § 11–51–118, 4B C.R.S. (1987), investigation and subpoena power, § 11–51–119, 4B C.R.S. (1987), and authority to revoke and suspend the effectiveness of a registration statement, § 11–51–112, 4B C.R.S. (1987).

Under the pre–1981 version of the Securities Act, every licensed broker-dealer was required to keep such records as the commissioner prescribed by rule. § 11–51–111(1), 4 C.R.S. (1973). All of the records of a licensed broker-dealer were subject to reasonable periodic examinations by the commissioner, within or without the state, as the commissioner deemed necessary or appropriate in the public interest. § 11–51–111(4), 4 C.R.S. (1973). For the purpose of avoiding unnecessary duplication of examinations, the pre–1981 statute authorized the commissioner to cooperate with "the securities administrators of other states, the securities and exchange commission, and any national securities exchange or national securities association registered under the 'Securities Exchange Act of 1934.'" *Id.* The Securities Act of 1981 does not incorporate this provision relating to the commissioner's authority to cooperate with other agencies and associations in the matter of examinations. The 1981 act, however, does empower the commissioner to enter into arrangements and other working relationships with federal, state, and self-regulatory authorities with respect to the filing and maintenance of a central depository system of public documents. § 11–51–117(3), 4B C.R.S. (1987).[2]

In somewhat broader fashion than the pre–1981 law, section 11–51–119(1) of the Securities Act of 1981 empowers the commissioner to make such public or private investigations within or outside the state as necessary to determine whether any person, not merely registered brokers or dealers, "has violated or is about to violate any provision of this article or any rule or order under this article or to aid in the enforcement of this article." Section 11–51–119(1) also states that, for the purpose of aiding in the enforcement of the act or in the prescribing of rules, the commissioner may require any person to file a statement as to the facts and circumstances concerning the matter to be investigated and may "publish information concerning any violation of this article or any rule or order under this article." In keeping with the commissioner's investigative and enforcement authority, section 11–51–119(3) of the Securities Act of 1981 states:

> The securities commissioner may, during customary business hours, conduct examinations, without resort to subpoena, of the books and records of any broker, dealer, principal, financial principal, representative, or financial representative transacting business in this state, whether or not such person is registered in this state.

Central to the controversy in this case are the first two sentences of section 11–51–117(2) of the Securities Act of 1981, which state:

> It is unlawful for the securities commissioner or any of his officers or employees to use for personal benefit any information which is filed with or ob-

---

either individually or in some fiduciary capacity but *not* as part of a *regular business*. The pre–1981 version of the Securities Act defined the term "broker-dealer" as "any person engaged in the business of effecting transactions in securities for the account of others or for his own account," and then listed several exclusions to the definition. § 11–51–102(1), 4 C.R.S. (1973).

**2.** The expressed intent of section 11–51–117(3) of the 1981 act is to provide the commissioner "with the power to reduce the duplication of filings, reduce administrative costs, and, in conjunction with other states and with federal authorities, establish uniform procedures, forms, and administration to be used by this state and by such other states and by such federal authorities."

tained by the securities commissioner and which is not made public. No provision of this article authorizes the security commissioner or any of his officers or employees to disclose any such information except among themselves or when necessary or appropriate in a proceeding or investigation under this article.[3]

### B.

The facts of this case are not in dispute. In July 1982 S.W. Devanney & Co., Inc. (hereinafter referred to as Devanney & Co.) was operating as a broker-dealer in securities in Denver, Colorado.[4] Stephen W. Devanney was the chief executive officer of the firm, which was registered with the Securities and Exchange Commission of the United States. On or about July 26, 1982, the commissioner (i.e., the Colorado Securities Commissioner), through an employee and pursuant to section 11–51–119(3), 4B C.R.S. (1987), commenced an examination of Devanney & Co.'s books and records in order to determine whether the firm was complying with Colorado law. During the examination the commissioner's employee discovered various records that indicated possible violations of the securities laws of other states. The employee made copies of these documents for the purpose of transmitting them to the appropriate regulatory and law enforcement agencies of other jurisdictions. Stephen Devanney, however, refused to allow the employee to remove the copies of these documents from the premises.

On July 28, 1982, Devanney & Co. and Stephen Devanney filed a complaint in the Denver District Court for a permanent injunction prohibiting the commissioner from removing copies of records from the premises of Devanney & Co. and from disseminating such documents to any third party. The commissioner answered the complaint and filed a counterclaim seeking a declaratory judgment concerning his authority under the Securities Act of 1981 to remove copies of records from a brokerage firm without resort to subpoena and to disseminate these documents to regulatory and law enforcement agencies within and outside Colorado. Both parties filed motions for summary judgment with respect to the commissioner's authority to make and remove copies of the records of a broker-dealer and to disseminate such documents to other agencies. The Denver District Court ruled that the commissioner could legally make copies of Devanney & Co.'s records and remove the copies from the firm's office, but that section 11–51–117(2) of the Securities Act of 1981 prohibited the commissioner from disclosing such information to other regulatory and law enforcement agencies, even under an agreement of confidentiality, unless such agencies were involved in the enforcement of the Colorado Securities Act.[5]

The commissioner appealed to the court of appeals, which affirmed the judgment. After noting that the language of section 11–51–117(2) was "clear on its face," the court held that the statute prohibited the commissioner and his agents from disclosing "information obtained in the course of an investigation to parties outside the office of the Colorado Securities Commis-

---

3. Section 11–51–117(2), 4B C.R.S. (1987), also contains a third sentence which states:

No provision of this article either creates or derogates from any privilege which exists at common law or otherwise when documentary or other evidence is sought under a subpoena directed to the securities commissioner or any of his officers or employees.

This sentence is not involved in the resolution of this case.

4. Devanney & Co. was operating as both a broker and a dealer at the time of the events in question, and we will use the term broker-dealer in referring to its activities.

5. Prior to the court's ruling on the summary judgment, the commissioner and Devanney & Co. entered into a stipulation regarding Devanney & Co.'s conduct in selling securities to residents of other states in violation of the laws of those states. The stipulation authorized the district court, pursuant to section 11–51–105, 4B C.R.S. (1987), to impose a three-day suspension of the exemption from registration for a broker or dealer registered under the Securities Exchange Act of 1934, and also a ten-day suspension of Stephen W. Devanney from acting as principal of Devanney & Co. The district court imposed the periods of suspension pursuant to stipulation.

sion" without regard to the presence or absence of any agreement of confidentiality. *S.W. Devanney & Co.*, 757 P.2d at 1090. The court of appeals found support for its holding in the fact that prior to 1981 the commissioner was authorized to conduct reasonable examinations of the records of a broker-dealer within and without the state as necessary in the public interest and to cooperate with other state and federal securities administrators for the purpose of avoiding duplicative examinations but no such provision was included in the Securities Act of 1981. We granted certiorari to consider whether the court of appeals correctly construed section 11–51–117(2) of the Securities Act of 1981.

## II.

■ Basic rules of statutory construction must guide our resolution of this case. It has been often repeated that a court's primary task in construing a statute is to give effect to the legislative purpose underlying the enactment. *E.g., Colorado Common Cause v. Meyer*, 758 P.2d 153, 160 (Colo.1988); *People v. Guenther*, 740 P.2d 971, 975 (Colo.1987); *Engelbrecht v. Hartford Accident and Indemnity Co.*, 680 P.2d 231, 233 (Colo.1984). To determine legislative purpose we first look to the statutory language itself, giving words and phrases their commonly accepted and understood meaning. *Colorado Common Cause*, 758 P.2d at 160; *Guenther*, 740 P.2d at 975; *People v. District Court*, 713 P.2d 918, 921 (Colo.1986). Where the statutory language is clear and unambiguous there is no need to resort to interpretative rules of statutory construction; the statute, in that instance, should be applied as written, since it may be presumed that the General Assembly meant what it clearly said. *E.g., State Board of Equalization v. American Airlines, Inc.*, 773 P.2d 1033, 1040 (Colo.1989).

If, however, statutory language is uncertain as to its intended scope, with the result that the statutory text lends itself to alternative constructions, then a court may appropriately look to pertinent legislative history in determining which alternative construction is in accordance with the ob-

jective sought to be achieved by the legislation, § 2–4–203(1)(c), 1B C.R.S. (1980); *see State Board of Equalization*, 773 P.2d 1033, 1040 (Colo.1989); *Industrial Commission v. Milka*, 159 Colo. 114, 119, 410 P.2d 181, 183–84 (1966), and also may consider the consequences of a particular construction, § 2–4–203(1)(e), 1B C.R.S. (1980). In the case of a statutory enactment patterned after a uniform law drafted by the National Conference of Commissioners on Uniform State Laws, a court may properly consider the official comments as well as the published comments of the drafters as a source for determining the meaning to be attributed to an ambiguous provision. *See* N. Singer, 2A *Sutherland Statutory Construction* § 52.05 (4th ed. 1984); *see also* § 2–4–203(1)(d), 1B C.R.S. (1980) (court, in determining legislative intent, may consider laws upon same or similar subjects).

Moreover, it must be presumed that the legislature intended a just and reasonable result in enacting the statute and that the public interest is to be favored over any private interest. § 2–4–201(1)(c) & (e), 1B C.R.S. (1980). Finally, a statute should be interpreted "so as to give consistent, harmonious, and sensible effect to all of its parts." *Colorado Common Cause*, 758 P.2d at 160. *See* § 2–4–201(1)(b), 1B C.R.S. (1980).

## III.

■ The commissioner claims that the court of appeals' interpretation of section 11–51–117(2) misconceives the purpose of the statute. Specifically, the commissioner argues that the Securities Act of 1981 was not intended to prohibit the disclosure at issue here and that any confidential financial information in the records of a broker-dealer can be protected from public disclosure by an agreement of confidentiality between the commissioner and the agencies to which the disclosures are made. For reasons hereinafter discussed we agree with the commissioner's claim.

## A.

Section 11–51–117(2) is practically a verbatim recital of section 406(b) of the Uni-

form Securities Act drafted in 1956 by the National Conference of Commissioners on Uniform State Laws. *See* Uniform Securities Act § 406, 7B U.L.A. 623 (1985).[6] The first sentence of section 11–51–117(2) makes it unlawful for the commissioner or any of his officers or employees to use "for personal benefit" any information obtained by the commissioner which is not made public. The meaning of this provision is clear: those officials responsible for administering the Securities Act of 1981 are prohibited from making use of any information obtained in the course of their official duties for the personal benefit of anyone.

The second sentence of section 11–51–117(2) states that "[n]o provision of the [Securities Act] authorizes the commissioner or any of his officers or employees to disclose any such information except among themselves or when necessary or appropriate in a proceeding or investigation under this article." This sentence reinforces the prohibition against unlawful use "for personal benefit" in the first sentence by making clear that all disclosures of information for the personal benefit of anyone are prohibited, but then excepts from the prohibition disclosures among the commissioner and his officers and employees in the discharge of their responsibilities and also disclosures made in connection with any proceeding or investigation in which they may be required to testify. *See* Uniform Securities Act § 406 comment, 7B U.L.A. 623 (1985). Although this second sentence might arguably be read as prohibiting any and all disclosures whatever, even those to regulatory and law enforcement agencies concerning law violations by a broker-dealer, it also can be read as reinforcing the prohibition in the first sentence against unlawful use for "personal benefit." If the latter interpretation is adopted,

then it would not prohibit the commissioner from making the disclosures in question.

We view the prohibitory language in the second sentence as facially ambiguous in its scope. Under such circumstances it is proper to draw upon available legislative history to determine its intended purpose. That the second sentence of section 11–51–117(2) was intended to prohibit the commissioner and his authorized agents from misusing and improperly disclosing information for the personal gain of anyone, and was not calculated to prohibit disclosures of law violations to regulatory and law enforcement agencies, is obvious from the drafters' commentary to section 406(b) of the Uniform Securities Act. This commentary states that "[t]he second sentence does not make disclosure 'unlawful' unless it is a step in a violation of the first sentence." L. Loss, *Commentary on the Uniform Securities Act*, Draftsmen's Commentary to § 406(b) (1976). In other words, when those officials responsible for administering the statutory scheme do not utilize information obtained in the course of an investigation for either their own personal benefit or the personal benefit of anyone else, but instead make use of such information in disclosing evidence of law violations to responsible regulatory and law enforcement agencies, such conduct is not "unlawful" for purposes of section 11–51–117(2). In our view, therefore, the purpose of section 11–51–117(2) is not to prohibit the commissioner from disclosing to other regulatory and law enforcement agencies information of law violations obtained in the course of an examination of the books and records of a broker-dealer. Rather, the purpose of the prohibition in section 11–51–117(2) is to prohibit officials charged with the responsibility of administering and enforcing the statutory scheme from making use of or improperly disclos-

6. Section 406(b) of the Uniform Securities Act states:

It is unlawful for the [Administrator] or any of [his] officers or employees to use for personal benefit any information which is filed with or obtained by the [Administrator] and which is not made public. No provision of this act authorizes the [Administrator] or any of [his] officers or employees to disclose any

such information except among themselves or when necessary or appropriate in a proceeding or investigation under this act. No provision of this act either creates or derogates from any privilege which exists at common law or otherwise when documentary or other evidence is sought under a subpoena directed to the [Administrator] or any of his officers or employees.

ing information obtained in their official capacities for the personal gain of themselves or anyone else.

### B.

Since section 11–51–117(2) was not intended to prohibit the commissioner from disclosing information of law violations to other regulatory and law enforcement agencies, we next examine whether any other provisions of the Securities Act of 1981 prohibit such disclosures. Section 11–51–119(1) authorizes the commissioner to conduct public or private investigations within or outside the state in order to determine whether any person has violated or is about to violate any provision of the act. It further empowers the commissioner, for purposes of aiding in the enforcement of the act, to require any person to file a statement as to facts and circumstances concerning the matters under investigation and vests the commissioner with authority to "publish information concerning any violation of this article or any rule or order under this article." These statutory provisions are at odds with the notion that the Securities Act of 1981 was somehow intended to prohibit the commissioner from disclosing to other regulatory and law enforcement agencies information regarding securities practices that arguably violate laws which those agencies are responsible for enforcing. Indeed, the inter-jurisdictional sharing of information is obviously contemplated by section 11–51–117(3), which expressly authorizes the commissioner to enter into arrangements and other working relationships with federal, other state, and self-regulatory agencies with respect to the filing and maintenance of public records in a central depository system.

Although section 11–51–117(3) relates only to public records, it nonetheless confirms the view that the exchange of information among state and federal regulatory agencies can serve as a helpful tool in the effective enforcement of the act both within and without the state of Colorado.[7]

### C.

We acknowledge that section 11–51–111(4) of the pre–1981 Securities Act authorized the commissioner to cooperate with the securities administrators of other states, the securities and exchange commission, and other national securities associations for the purpose of avoiding "unnecessary duplication of examinations" and that this exact statutory language was not enacted into the Securities Act of 1981. The fact that the Securities Act of 1981 did not expressly incorporate this statutory text, however, is not to say that the General Assembly thereby intended to prohibit the commissioner from making the disclosures at issue here. In our view, neither the text nor the structure of the Securities Act of 1981 supports such a prohibition.

Where legislation does not prohibit a governmental official responsible for administering a statutory program from taking certain action with respect to illegal activity discovered in the course of the official's execution of his statutory responsibilities, we may appropriately ask whether the official's contemplated action either fosters or frustrates the purpose sought to be achieved by the legislative scheme. *See* § 2–4–203(1)(a), 1B C.R.S. (1980). The only plausible answer to that question is that the commissioner's disclosures of law violations to other state and federal regulatory and law enforcement agencies will substan-

---

**7.** In 1985 the National Conference of Commissioners on Uniform State Laws replaced the 1956 Uniform Securities Act with a new act which expressly recognizes the need for inter-jurisdictional exchange of information for the purpose of a civil, administrative, or criminal investigation or proceeding by a regulatory or law enforcement agency. Section 703(c)(2) states that the commissioner may disclose:

information obtained in connection with an investigation [to determine whether a person has violated or is about to violate the Securi-

ties Act] if disclosure is for the purpose of a civil, administrative, or criminal investigation or proceeding by a securities agency, law enforcement agency, or administrator specified in Section 704(a), and the receiving agency or administrator represents in writing that under applicable law protections exist to preserve the integrity, confidentiality, and security of the information.

Uniform Securities Act § 703(c)(2), 7B U.L.A. (Supp.1989).

tially contribute to the statutory goal of protecting the public from fraudulent or deceptive practices in securities transactions. Construing the statute to prohibit such disclosures would impair this basic objective by shielding from governmental scrutiny illegal practices of brokers and dealers operating in Colorado and selling securities in other states in violation of the securities laws of other jurisdictions.

Although the records of a broker-dealer might contain confidential commercial or financial information, and thus may not qualify as a public record under Colorado's Public Records Act, *see* § 24–72–204(3)(a)(IV), 10B C.R.S. (1988) (custodian of records shall deny right of inspection of confidential commercial or financial data furnished by or obtained from any person),[8] we are satisfied that the overriding public interest in preventing illegal securities practices clearly militates in favor of permitting the commissioner to disclose a broker-dealer's records to other governmental agencies for law enforcement purposes, insofar as such records are indicative of illegal activity. Such disclosures are not releases to the public within the intendment of the Public Records Act. *Cf. Ashland Oil, Inc. v. Federal Trade Commission,* 548 F.2d 977 (D.C.Cir.1976) (per curiam) (disclosure by Federal Trade Commission to congressional subcommittee of material consisting of trade secrets not violative of statutory prohibition against public disclosure of commissioner's trade secrets, in absence of substantial showing that such material would necessarily be made public by Congress); *Charles River Park "A," Inc. v. Department of Housing and Urban Development,* 519 F.2d 935 (D.C.Cir.1975) (Freedom of Information Act does not prevent government agency from disclosing to state official information otherwise exempt from public disclosure where disclosure would serve legitimate governmental interest of state); *Interco, Inc. v. Federal Trade Commission,* 478 F.Supp. 103 (D.D.C.1979) (even if company's documents submitted to Federal Trade

Commission may be classified as confidential commercial or financial information and thus exempt from disclosure under Freedom of Information Act, commissioner is not required to claim exemption in response to requests for documents by state attorney general in order to determine whether company violated state antitrust laws), *on remand,* 490 F.Supp. 39 (D.D.C.1979).

To the extent that brokers, dealers, and their respective clients might have some interest in preserving the privacy of their commercial or financial records, such interest should properly yield to the overriding public goal of preventing fraudulent and other deceitful practices in connection with the sale or purchase of securities. Moreover, the commissioner may adequately protect any privacy interests in the records by disclosing such information under an agreement of confidentiality, whereby the agencies to which the disclosures are made agree to use such information for law enforcement purposes only. *See generally Interco,* 490 F.Supp. at 44–46.

We hold that neither section 11–51–117(2) of the Securities Act of 1981 nor any other provision of the act prohibits the commissioner from disclosing to other state and federal regulatory and law enforcement agencies, under an agreement of confidentiality, information regarding possible law violations obtained by the commissioner during an examination of the books and records of a broker-dealer transacting business in the State of Colorado. We accordingly reverse the judgment of the court of appeals.

---

8. Section 24–72–206, 10B C.R.S. (1988), makes it a misdemeanor to willfully and knowingly violate the provisions of the Public Records Act.