Nick KANE; Penny L. Kane; Nicky's Restaurant and Lounge, Ltd., a Colorado corporation; Nicky's Restaurant, Lounge and Motor Lodge, a Colorado corporation; Perry E. Bartlett and Audrey M. Bartlett, d/b/a Deer Crest Chalets; Don L. Heinemann and Nelrose R. Heinemann, d/b/a The Villager Motel; Crossed Fingers, Inc., d/b/a Eicher's Motor Inn, a Colorado corporation; Aldon and Elizabeth Olson; Ronald C. Brodie; Brodie's Supermarket, Inc.; Lloyd and Mary Meyers; Lonigan's, a Colorado general partnership; Park Wheel Corporation, a Colorado corporation; Steven Nagl; Lon Kinnie; Bruce Beckord; Bob Copper; Edward Grueff; Gerard Pearson; James Durward; Goran Svenonius; Rachel and J.R. Preston; D.A. Lienemann, Sr., d/b/a Fall River Estates; and Charlotte Miller, d/b/a "Indian Village" and APROPO, Inc., Plaintiffs–Appellants,

v.

The TOWN OF ESTES PARK, a Colorado municipality, Defendant–Appellee.

No. 87SA408.

Supreme Court of Colorado, En Banc.

Feb. 5, 1990.

As Modified on Denial of Rehearing March 5, 1990.

French & Stone, P.C., Joseph C. French and David M. Haynes, Boulder, for plaintiffs-appellants Nick Kane, Penny L. Kane, Nicky's Restaurant and Lounge, Ltd., Nicky's Restaurant, Lounge and Motor Lodge, Perry E. Bartlett and Audrey M. Bartlett, d/b/a Deer Crest Chalets, Don L. Heinemann and Nelrose R. Heinemann, d/b/a The Villager Motel, Crossed Fingers, Inc., d/b/a Eicher's Motor Inn, Aldon and Elizabeth Olson, Ronald C. Brodie, Brodie's Supermarket, Inc., Lloyd and Mary Meyers, Lonigan's, Park Wheel Corp., Steven Nagl and Lon Kinnie.

Bragg, Baker and Cederberg, P.C., Jonathan M. Jellema, Denver, for plaintiffs-appellants Bruce Beckord, Bob Copper, Edward Grueff, Gerard Pearson, James Durward and Goran Svenonius.

Dale S. Carpenter, Lakewood, for plaintiffs-appellants Rachel and J.R. Preston and D.A. Lienemann, Sr., d/b/a Fall River Estates.

Miller, Hale & Harrison, Robert Bruce Miller, Boulder, for plaintiff-appellant Charlotte Miller, d/b/a "Indian Village" and APROPO, Inc.

Anderson, Campbell & Laugesen, P.C., Laird Campbell, Denver, for defendant-appellee.

Justice LOHR delivered the Opinion of the Court.

This case stems from the 1982 failure of the Lawn Lake Dam. The dam failure caused a massive quantity of water to rush downstream, overwhelming the small Cascade Dam and Reservoir, owned and operated by the Town of Estes Park (Estes Park). The combined waters proceeded onward, leaving a trail of destruction in their wake. The issue in this case is whether Estes Park can be held liable, on theories of strict liability or negligence, for the resulting personal injuries and property damage. The trial court granted summary judgment in favor of Estes Park. It held that Estes Park was exempt from the strict liability provision of section 37-87-104(1), 15 C.R.S. (1982 Supp.), and that a reservoir owner has no duty to guard against upstream dam failures. We affirm the trial court's grant of summary judgment.

I.

The Lawn Lake Dam was located on the Roaring River in Rocky Mountain National Park, high above the town of Estes Park. On July 15, 1982, the dam failed, sending approximately four hundred fifty acre-feet of water rushing downstream into the Fall River, upon which Estes Park's Cascade Dam was located. The descending water soon inundated the ten acre-feet capacity Cascade Reservoir and breached the Cascade Dam. The waters then swept through Estes Park, causing injury to persons and damage to property.

Several lawsuits were filed and then consolidated in Larimer County District Court. Estes Park was among the defendants.[1]

---

1. The claims against Estes Park were part of a larger group of claims stemming from the fail-

The trial court granted summary judgment in favor of Estes Park, and the plaintiffs appealed.[2]

## II.

The plaintiffs assert that Estes Park is strictly liable for any damage resulting from the failure of Cascade Dam. The trial court held that strict liability was governed by section 37–87–104, 15 C.R.S. (1982 Supp.), and that the provisions of that statute expressly exclude a public entity such as Estes Park.

At the time of the dam failure, section 37–87–104, 15 C.R.S. (1982 Supp.), governed the liability of reservoir owners. It provided:

(1) Except as provided in subsection (2) of this section, the owner of a reservoir shall be liable for all damages arising from leakage or overflow of the waters therefrom or floods caused by the breaking of the embankments of such reservoir.

(2) No employee, shareholder, or member of a board of directors of an owner of a reservoir shall be liable for any damage arising from leakage or overflow of the waters from such reservoir or for any damage arising from floods caused by breaking of the embankments of such reservoir if a valid liability insurance policy has been purchased by the owner of the reservoir and is in effect at the time such damage occurs. Such insurance policy shall insure against such damages and provide coverage in an amount of not less than fifty thousand dollars for each claim and in an aggregate amount of not less than one million dollars for all claims which arise out of any one incident. The policy may provide that it does not apply to any act or omission of an employee, shareholder, or member of a board of directors of an owner, if such act or omission is dishonest, fraudulent, malicious, or criminal. The policy may also contain other reasonable provisions with respect to policy periods, territory, claims, conditions, and other matters common to such policies of insurance. The limitation of liability pursuant to this subsection (2) shall not apply to any criminal, fraudulent, or malicious act by a member of the board of directors of the owner, a shareholder of the owner, or an employee of such owner nor shall it apply to any ultra vires act of the owner or of a member of the board of directors, a shareholder, or an employee of such owner. The provisions of this subsection (2) shall not be deemed to impose any liability upon a member of the board of directors, a shareholder, or an employee of the owner of a reservoir beyond that established by other principles or provisions of law.

(3) As used in this section, the word "owner" does not include public entities or public employees as defined in the "Colorado Governmental Immunity Act", article 10 of title 24, C.R.S.1973.

Act approved May 27, 1981. Ch. 428, 1981 Colo.Sess.Laws 1778–79.[3]

---

ure of the Lawn Lake Dam. The claims were filed in a number of lawsuits originally brought in Denver District Court and Larimer County District Court. The Denver actions ultimately were transferred to Larimer County District Court and consolidated with the cases originally filed in that court. See C.R.C.P. 42, 42.1. Other defendants in the suits included The Farmers Irrigating Ditch and Reservoir Company, an owner and operator of the Lawn Lake Dam; officers and directors of that company; the State of Colorado; the Colorado State Engineer; and the Director of the Department of Natural Resources of the State of Colorado. All claims involving these other defendants were resolved by agreement and dismissed after oral argument in this court, leaving only the claims against Estes Park remaining to be determined.

**2.** This appeal originally involved challenges to the constitutionality of § 37–87–104(2), 15 C.R.S. (1982 Supp.), and therefore initial appellate jurisdiction was in the Colorado Supreme Court. See § 13–4–102(1)(b), 6A C.R.S. (1987). These constitutional issues were presented by the claims that ultimately were resolved by agreement after oral argument. In the interest of judicial economy, we elect to address the issues remaining instead of remanding the case to the Colorado Court of Appeals.

**3.** § 37–87–104 was repealed and reenacted in 1986, see Ch. 233, sec. 1, § 37–87–104, 1986 Colo.Sess.Laws 1091, 1091–92, and appears in its present form in § 37–87–104, 15 C.R.S. (1989 Supp.). The changes were substantial and included the elimination of strict liability and the

■ In interpreting statutes our primary task is to determine and give effect to the legislature's intent. *Kern v. Gebhardt,* 746 P.2d 1340, 1344 (Colo.1987). To determine the legislature's intent we look first to the statutory language. *People v. District Court,* 713 P.2d 918, 921 (Colo.1986). When the statutory language is plain, our inquiry need go no further. *Kern,* 746 P.2d at 1344; *Harding v. Industrial Comm.,* 183 Colo. 52, 59, 515 P.2d 95, 98 (1973).

■ Section 37–87–104(3) excludes from the term "owner" all "public entities" as defined in the Colorado Governmental Immunity Act. An incorporated town is a public entity as defined in that act. § 24–10–103(5), 10A C.R.S. (1988).[4] The plain language of section 37–87–104, therefore, excludes an incorporated town such as Estes Park from both the strict liability provision of subsection (1) and the insurance provisions of subsection (2).

The plaintiffs argue that the legislature intended to exempt public entities from only the insurance provisions of subsection (2) and not from the strict liability imposed by subsection (1). We cannot agree. Even were we to look beyond the plain meaning of section 37–87–104, we would not find the limited legislative history of Senate Bill 259, which added subsections (2) and (3) to section 37–87–104, to require a different result. Although discussion at the legislative hearings focused on the insurance and immunity provisions of subsection (2), a review of the testimony at the hearings does not establish with any degree of clarity that subsection (3) was intended to exempt public entities from the subsection (2) provisions only and not from strict liability under subsection (1) as well. We interpret the statute according to its plain meaning and hold that public entities are not subject to the strict liability imposed by section 37–87–104.

■ The plaintiffs argue that even if public entities are not subject to the strict liability imposed by section 37–87–104, they remain subject to the common law rule of strict liability for dam and reservoir owners. Colorado's first statutory provision holding reservoir owners strictly liable was a codification of the pre-existing common law rule. *See Sylvester v. Jerome,* 19 Colo. 128, 134–35, 34 P. 760, 762 (1893). Although a pre-existing common law rule remains in full force unless and until the legislature repeals it, § 2–4–211, 1B C.R.S. (1980), "[t]he legislature may at any time by a legislative act, repeal any part of the common law either expressly or by passage of an act inconsistent therewith on any particular subject." *Colorado State Bd. of Pharmacy v. Hallett,* 88 Colo. 331, 335, 296 P. 540, 542 (1931). The statutory provisions governing liability of dam and reservoir owners, found in section 37–87–104, are comprehensive, preempting the common law. This court, in fact, has held that the common law in this area is not controlling because "statutes fix the liability of reservoir owners." *Garnet Ditch & Reservoir Co. v. Sampson,* 48 Colo. 285, 288, 110 P. 79, 80 (1910). Section 37–87–104's exclusion of public entities from the section's strict liability provision persuades us that the legislature intended to repeal any existing common law that might make public entities strictly liable.

### III.

■ We now consider whether the trial court erred in granting summary judgment for Estes Park on the plaintiffs' negligence claims. Under C.R.C.P. 56(c), summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Camacho v. Honda Motor Co., Ltd.,* 741 P.2d 1240, 1248–49 (Colo.1987).

The trial court held that:

---

substitution of negligence as the basis for a claim against the owner of a water storage reservoir for damages caused by escaping water.

**4.** § 24–10–103(5) defines a public entity as "the state, county, city and county, incorporated city or town, school district, special improvement district, and every other kind of district, agency, instrumentality, or political subdivision of the state organized pursuant to law."

[a]s a matter of law ... the mere owning or maintaining of a reservoir facility downstream from other waters impounded places no duty on the owner of the downstream facility to (1) build their facilities to accept and hold waters that might escape from an upstream facility; (2) to inspect or maintain or take other such action in regards to the upstream facility.[5]

In a negligence action, the plaintiffs must establish, among other things, that the defendant owed a duty of care to the plaintiff. *Board of County Comm'rs v. Moreland*, 764 P.2d 812, 816 (Colo.1988); *Leake v. Cain*, 720 P.2d 152, 155 (Colo. 1986). Whether a defendant owes a duty to a plaintiff is a question of law to be determined by the court. *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo.1986); *Metropolitan Gas Repair Service, Inc. v. Kulik*, 621 P.2d 313, 317 (Colo. 1980). The determination whether a duty exists is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." *University of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987) (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 53, at 358 (5th ed. 1984)). We have also written that this determination "is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987). The determination whether a duty exists requires the consideration of various factors including "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm,

and the consequences of placing the burden upon the actor." *Smith*, 726 P.2d at 1127.

Estes Park concedes that it owed a duty of care to the plaintiffs. It differs fundamentally with the plaintiffs, however, as to the scope of that duty. The plaintiffs argue that the failure of an upstream dam was foreseeable[6] and therefore Estes Park had a duty to design and construct its facilities so that Cascade Reservoir would either contain the waters from Lawn Lake Reservoir or would permit those waters to pass through Cascade Reservoir without being augmented by waters stored in Cascade Reservoir.

Even if the failure of a dam is foreseeable in the sense that experience shows that dams occasionally fail, foreseeability of an upstream dam failure is not the only factor in determining whether Estes Park had a duty to guard against that eventuality. The record does not reflect the purposes for which Estes Park owned and operated its dam, but presumably they were public purposes incident to the town's municipal functions. At the time of the failure of Lawn Lake Dam, Lawn Lake Reservoir contained approximately four hundred fifty acre-feet of water.[7] Cascade Reservoir had a total capacity of only ten acre-feet. The great expense that would be required to design and build a Cascade Dam capable of holding the entire capacity of Lawn Lake Reservoir or to bypass such a large quantity of water and accompanying debris without damaging the Cascade Dam and Reservoir facilities is evident without need for detailed development in the record. To impose a burden on a downstream builder to construct facilities adequate to hold or bypass the entire capacity of an upstream reservoir has the potential for foreclosing construction of beneficial downstream storage facilities because of prohibitive costs.

---

**5.** On appeal, the plaintiffs do not argue that the owner of a downstream dam and reservoir has a duty to inspect or maintain an upstream dam and reservoir owned and operated by another.

**6.** The plaintiffs do not argue that Estes Park was aware of any facts concerning Lawn Lake Dam that should have caused Estes Park to foresee the failure of that particular dam. The plaintiffs' argument is that it is foreseeable that any

dam may fail. Moreover, the plaintiffs do not contend that Estes Park had notice of the impending Lawn Lake Dam failure in time to drain Cascade Reservoir before the arrival of the Lawn Lake Reservoir waters.

**7.** The evidence indicates that the capacity of Lawn Lake Reservoir was substantially greater than the amount of water impounded at the time of the failure of Lawn Lake Dam.

Considering all relevant factors, we conclude that the duty owed by Estes Park to the plaintiffs did not extend to construction of facilities that would contain or bypass the flow from Lawn Lake Reservoir without augmenting it with the water stored behind Cascade Dam.

## IV.

In summary, we hold that public entities that own dams or reservoirs are not subject to strict liability for damages caused by water escaping from their dams or reservoirs. Furthermore, we hold that Estes Park had no duty to ensure that waters released from an upstream reservoir because of a dam failure of this magnitude would be contained by its facilities or would bypass those facilities without augmentation. Accordingly, we affirm the trial court's grant of summary judgment.

ROVIRA, J., does not participate.